1

2

Honorable Barbara J. Rothstein

3

4

5

6

UNITED STATES DISTRICT COURT

7

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

8

9

No. 2:15-cv-01608 - BJR

10

CONRAD REYNOLDSON, STUART

JOINT MOTION FOR ORDER: (1)

PIXLEY, and DAVID WHEDBEE, on behalf

GRANTING PRELIMINARY

11

of themselves and all others similarly situated,

APPROVAL OF CLASS ACTION

SETTLEMENT; (2) GRANTING

12

CERTIFICATION OF SETTLEMENT

Plaintiffs,

CLASS; (3) DIRECTING NOTICE TO

13

THE CLASS; AND (4) SETTING DATE

v.

FOR FAIRNESS HEARING

14

CITY OF SEATTLE, a public entity,

15

**CLASS ACTION**

16

Defendant.

NOTE ON MOTION CALENDAR:

17

JULY 17, 2017

18

19

Plaintiffs Conrad Reynoldson, Stuart Pixley, and David Whedbee ("Plaintiffs") and

20

Defendant City of Seattle (the "City") request preliminary approval of a settlement that provides

21

extensive injunctive relief to a class of tens of thousands of people with mobility disabilities

22

("Settlement Class" or "Class Members") who use the City's pedestrian facilities while

23

24

eliminating the risk of duplicative litigation.  The proposed Consent Decree ("Consent Decree"

25

or "Decree") that embodies the parties' settlement[1] requires the City, in conjunction with third

26

27

[1] The proposed Consent Decree is attached as Exhibit A to the Declaration of Timothy P. Fox in Support of Joint Motion for Preliminary Approval of Settlement ("Fox Decl.").

JOINT MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT - 1
Case No. 2:15-cv-01608 - BJR

parties, to install or remediate 1,250 curb ramps per year for the eighteen-year term of the Decree ("Compliance Period").  The Consent Decree makes allowances for minor variations to this schedule, but it guarantees the installation or remediation of 22,500 curb ramps during the Compliance Period, and requires that those curb ramps will meet the 2010 Americans with Disabilities Act ("ADA") Standards for Accessible Design ("2010 ADA Standards"), or any subsequently adopted federal disability access standards that apply to the pedestrian rights-of-way during the Compliance Period.  In meeting this requirement, when the City alters roadways or pedestrian facilities, it will install curb ramps where missing and upgrade curb ramps where present but noncompliant.  Similarly, where streets are altered by utilities, other public entities, or private developers, curb ramps will be installed or remediated.  As a result of these provisions, nearly $300 million dollars will be spent installing and remediating curb ramps in the City that comply with federal and state disability access laws. Fox Decl. ¶ 34.

The Consent Decree also provides that the City will improve its system for Class Members to request that curb ramps be installed or repaired at specific locations, and that the City will make its best efforts to investigate those requests within 30 days of receipt and fulfill the requests within twelve months of receipt.  In addition, the Consent Decree requires that the City maintain its ADA Coordinator position within the Seattle Department of Transportation ("SDOT").[2]  The Decree also includes effective mechanisms for reporting, monitoring, and dispute resolution to ensure that the City complies with its obligations to the Class throughout the term of the Decree.

The Consent Decree is the result of more than three years of factual investigation and arms-length negotiation.  The parties reached agreement after four formal mediation sessions

---

[2] SDOT first hired its dedicated ADA Coordinator in March 2015.  The City had employed a Citywide ADA Coordinator prior to this date.

JOINT MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT - 2
Case No. 2:15-cv-01608 - BJR

under the supervision of Teresa A. Wakeen, and many in-person and telephone negotiations between counsel.

The proposed class action settlement embodied in the Consent Decree is fair, adequate, and reasonable.  It satisfies all of the criteria for preliminary settlement approval under Rule 23 of the Federal Rules of Civil Procedure.  Accordingly, the parties ask that the Court: (i) preliminarily approve the settlement; (ii) certify the proposed Settlement Class and appoint the Named Plaintiffs as Settlement Class Representatives and Plaintiffs' attorneys as Settlement Class Counsel; (iii) approve the proposed form of the class notice and distribution plan; and (iv) set a fairness hearing.

## I.      BACKGROUND

On January 17, 2014, Plaintiffs' Counsel sent a letter to the offices of the Seattle City Attorney and SDOT alleging that the City lacked adequate curb ramps that comply with applicable requirements of federal and Washington State disability rights laws.  Fox Decl. ¶ 13.  The letter proposed that the parties work cooperatively to resolve these problems as an alternative to litigation.  *Id.*  On February 19, 2014, the parties signed an agreement to toll the statute of limitations for all claims under federal and state law based on the City's alleged failure to provide adequate curb ramps for people with mobility disabilities.  *Id.* ¶ 14.  For nearly two years, the parties exchanged information and documents pertaining to the status of existing curb ramps in the City's pedestrian rights-of-way, the City's ongoing and future construction and remediation of curb ramps in the City's pedestrian rights-of-way, the identification of locations where the installation or remediation of curb ramps remained necessary, and the City's past and present policies concerning curb ramps.  *Id.* at ¶ 17.  Plaintiffs' Counsel created a database to be able to analyze all of this information in the aggregate.  *Id.* at ¶ 8.  Plaintiffs' Counsel also

conducted in-person inspections of various curb ramps and sidewalk corners in Seattle's pedestrian rights-of-way in order to substantiate Plaintiffs' position regarding Seattle's noncompliant sidewalk corners and curb ramps. *Id.* at ¶ 9. Although negotiations were productive, the parties ultimately did not reach a resolution while avoiding litigation. *Id.*

On October 8, 2015, Plaintiffs filed a putative class action in this Court. (ECF No. 1.) They alleged, on behalf of themselves and all others similarly situated, that the City had failed and was failing to install and maintain curb ramps that are necessary to make its pedestrian rights-of-way readily accessible to individuals with mobility disabilities in violation of Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and the Washington Law Against Discrimination, 49 Wash. Rev. Code §§ 49.60.010 *et seq.* ("WLAD"). Plaintiffs also alleged that the City had violated and was violating the ADA, Section 504, and WLAD by failing to install or remediate curb ramps in conjunction with new construction and alteration of streets, bus stops, and sidewalks. *Id.* ¶ 1.

On January 12, 2016, the City answered, denying liability and asserting that the City had complied with and was continuing to comply with its obligations under the ADA, Section 504 and all other similar statutes and that the City's services, programs and activities, when viewed in their entirety are accessible to persons with disabilities. (ECF No. 22). The City further answered that at the time the Complaint was filed, the City was engaged in an ADA Self-Evaluation, which was comprised of a City-wide survey of the attributes of its known curb ramps conducted by an outside consultant ("KFH Survey"). Plaintiffs had been involved in designing the parameters of the KFH Survey before they filed this case.

On April 25, 2016, the parties filed a stipulated motion for class certification under Federal Rule of Civil Procedure 23(b)(2). (ECF No. 29.) On May 2, 2016, the Court granted the

motion, certifying a Class defined as:

> All persons (including residents of and/or visitors to the City of Seattle) with any mobility disability, who, at any time prior to judgment in this action, have been denied full and equal access to the City of Seattle's pedestrian right of way due to the lack of a curb ramp or a curb ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use.

(ECF No. 30.)

Since filing this case, Plaintiffs have served the City with two sets of interrogatories, two sets of requests for production of documents, and three sets of requests for admission.  Fox Decl. ¶ 17.  The purpose of these discovery requests was to clarify the scope of the City's obligations under the ADA, Section 504, and WLAD, as well as identify future work needed to ensure compliance with these statutes.  *Id.*  As part of the discovery process, the City collected over 2.5 terabytes (TB) of data from SDOT, and provided to Plaintiffs voluminous information regarding the City's past, present, and future work to improve accessibility in the pedestrian rights-of-way. *Id.*  The City also provided Plaintiffs full and unrestricted access to SDOT's asset management database ("Hansen") and the complete results of the KFH Survey.  Finally, the City voluntarily made SDOT staff available to the Plaintiffs on multiple occasions to provide information and training on use of the Hansen database and other technical issues.  *Id.*

Beginning on May 24, 2016, the parties participated in four mediation sessions under the supervision of Mediator Teresa A. Wakeen.  These mediations and the accompanying negotiations were time- and resource-intensive for both parties and ultimately succeeded in resolving this action.  *Id.* ¶ 18.

## II.   <u>SUMMARY OF PROPOSED SETTLEMENT</u>

The Consent Decree, attached in full as Exhibit 1 to the Declaration of Timothy P. Fox, includes the following negotiated and agreed-upon terms:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

A.    **Certification of the Settlement Class**

The parties stipulate to a Settlement Class for injunctive relief under Rules 23(a) and

(b)(2) of the Federal Rules of Civil Procedure, defined as:

> all persons (including residents of and/or visitors to the City of Seattle) with any
> mobility disability, who, at any time prior to judgment in this Action, have been
> denied full and equal access to the City's pedestrian right of way due to the lack
> of a curb ramp or a curb ramp that was damaged, in need of repair, or otherwise in
> a condition not suitable or sufficient for use.

Ex. 1 at 9.  This definition is identical to that of the certified Class and therefore does not expand

the class membership or legal claims that this Court has previously certified.  It is therefore

appropriate for class certification under Rules 23(a) and (b)(2).

B.    **Injunctive Relief**

1.    **Installation and Remediation of Curb Ramps**

a.    **New Construction and Alteration**

Under the Consent Decree, when the City performs construction or alteration of its

roadways or pedestrian facilities, the City (and applicable third parties such as utility providers

or private developers) will install curb ramps that are missing and upgrade curb ramps that do not

comply with applicable disability access standards at all locations affected by the project.

Decree §§ V.3.1, 3.2; 28 C.F.R. § 35.151(a), (b).  The only exceptions arise where the City can

demonstrate that installation or upgrade is structurally impracticable, in conjunction with new

construction, *see* 28 C.F.R. § 35.151(a)(2), or technically infeasible, in conjunction with

alteration of an existing facility, *see* 28 C.F.R. § 35.151(b)(2). Decree V.2.1, V.2.2.  When

construction projects that affect the pedestrian rights-of-way occur, the City will ensure that

accessible temporary routes are provided and have appropriate signage directing persons with

mobility disabilities to such accessible temporary routes.  *Id.* § 2.3.  The City will also use its

best efforts to ensure that all third-party construction, alteration, and development projects

affecting pedestrian facilities are performed in compliance with disability access standards.  *Id.* §
2.4.

If, at any point, the City determines that installation or remediation of a curb ramp is
structurally impracticable or technically infeasible, it will ensure that a curb ramp is installed or
remediated such that it complies with accessibility laws to the maximum extent feasible.  *Id.* §§
3.1, 3.7, 5.4.  A determination of structural impracticability or technical infeasibility must be
supported by adequate documentation.  *Id.* § 4.3.

> b.    **Annual Commitment**

The Consent Decree requires the installation or remediation of a certain number of curb
ramps in the City in each calendar year (the "Annual Commitment").  The Annual Commitment
includes curb ramps installed or remediated in conjunction with new construction and alteration
of roadways and pedestrian facilities, as well as those installed or remediated in response to
requests made by persons with mobility disabilities.  *Id.*  The Annual Commitment also includes
the installation of new Accessible Curb Ramps and remediation of existing non-Compliant curb
ramps anywhere within the City by the City or by any third-party, and includes curb ramps that
are remediated or installed pursuant to the Curb Ramp Request System.  *Id.*  For the period
commencing July 1, 2017 and ending on December 31, 2017, and the period commencing
January 1, 2035 and ending on July 1, 2035, the Annual Commitment is 625 ramps.  For all
calendar years in between January 1, 2018 and December 31, 2034, the Annual Commitment is
1250 ramps.  Decree § V.3.1.

The Consent Decree permits the City to install and remediate curb ramps ahead of this
schedule.  If it does so, it may bank up to a total of 625 curb ramps, which it may then credit to a
later calendar year.  *Id.* § 3.2.  In addition, if the City experiences unexpected delays in major

capital improvement projects based on factors outside of the City's control, it may install or remediate up to 225 fewer than the Annual Commitment of curb ramps, but it must make up the deficit within two years.  *Id.*

As a result of these provisions, nearly $300 million dollars will be spent to install and remediate curb ramps in accordance with federal and state disability access laws.  Fox Decl. ¶ 34.

### 2.   Prioritization and Transition Plan

Apart from the curb ramps that it installs and remediates in conjunction with new construction and alterations in roadways and pedestrian facilities, the City will prioritize curb ramp installation and remediation based on their proximity to the following locations:

a.   Government offices, facilities, and schools (including the pedestrian rights of way adjacent to facilities owned or operated by the City, and the paths of travel leading from such adjacent pedestrian rights of way to the primary entrances to such facilities);

b.   Transportation corridors;

c.   Hospitals, medical facilities, assisted living facilities and other similar facilities;

d.   Places of public accommodation such as commercial and business zones;

e.   Facilities containing employers; and

f.   Residential neighborhoods.

*See* 28 C.F.R. § 35.150; Decree § V.3.5.

Under the Consent Decree, the City will create a Transition Plan pursuant to 28 C.F.R. § 35.150(d).  *See also* 45 C.F.R. § 84.22(e).  The Transition Plan will identify specific projects and specific curb ramps to be installed and remediated in fulfillment of the City's Annual

Commitment under the Consent Decree.  Decree § V.3.6.  The Transition Plan will be updated periodically to specifically identify additional projects and curb ramps to fulfill the City's Annual Commitment.  The Transition Plan and updates to the Transition Plan will follow the order of priorities set out above and also incorporate input from Plaintiffs, Class Members, and government agencies, such as the Washington State Department of Transportation, Sound District, or Seattle school districts.  *Id.*

> **3.**    **Curb Ramp Request Program**

Throughout the eighteen-year Compliance Period, the City will maintain a procedure for residents to request installation, remediation, and maintenance of curb ramps.  Decree § V.5.1.  Within thirty days of the effective date of the Consent Decree, the parties will agree upon both the form for submitting requests, and the method or methods for submitting requests, including through an easily locatable and accessible form on the City's website that complies with the Web Content Accessibility Guidelines, a toll-free telephone number, electronic mail, standard mail, and/or other non-onerous methods for making requests.  The City will document receipt of each curb ramp request, assign each request a specific identification number (or other identifying information), and log the request into a software program or other electronic system that records the requestor's name and contact information, the date of the request, and the location of the requested curb ramp installation or repair.  By no later than thirty days from the effective date of the Consent Decree, the City will update its current website to describe the methods for making curb ramp requests and the process and timeline for fulfilling those requests.  *Id.* § V.5.6.

Within 15 days of receipt, the City will notify requestors that their requests have been received.  *Id.* § V.5.2.  The City will use its best efforts to investigate each request within 30 days of receipt.  *Id.* § V.5.3.  With limited exceptions, the City will use its best efforts to install or

repair each requested curb ramp within twelve months of receiving the request.  *Id.* § V.5.4.

### 4.   ADA Coordinator

Throughout the Term, SDOT will employ an ADA Coordinator who will assist in developing the Transition Plan and implementing the Consent Decree.  *Id.* § V.1.2.  The individual selected as the ADA Coordinator will have qualifications comparable to the following: (i) experience in evaluating or assisting public entities in evaluating the accessibility of facilities under Title II of the ADA and Section 504; (ii) knowledge of current federal and state accessibility standards; (iii) a minimum of five (5) years' experience in providing ADA consulting services related to accessible facilities; and (iv) a degree in civil engineering, urban planning, or architecture.  *Id.* § V.1.1.  SDOT hired a dedicated  ADA Coordinator in March of 2015, approximately one year into the parties' settlement negotiations.

### 5.   Reporting

On an annual basis during the first quarter of each year of the Decree, the ADA Coordinator will report to the parties, in writing, regarding the status of the City's compliance with the Consent Decree.  Decree § V.7.1.  As a component of its annual report, the City shall provide access to the following information, including remote access to the City's databases and data management programs, if applicable: (a) a list that identifies the curb ramps that will be installed or remediated for the coming year, and those that were installed or remediated during the past year; (b) access to documentation regarding determinations that a particular curb ramp was structurally impractical, technically infeasible, or made accessible to the maximum extent feasible; (c) a description of all curb ramp requests made during the past year; (d) access to photographs of all curb ramps that were installed or remediated over the previous year; (e) access to photographs of all curb ramp locations that the City contends were subject to structural

impracticability or technical infeasibility defenses; and (f) all complaints and grievances received by the Seattle Department of Transportation or the City ADA Coordinator related to curb ramps. *Id.*

**C.**    **Monitoring**

Throughout the Term, Plaintiffs and Plaintiffs' Counsel may conduct periodic inspections of the City's curb ramp drawings and designs, and copies of such drawings and designs will be provided to Plaintiffs and Plaintiffs' Counsel upon reasonable request.  Decree § V.7.3. Plaintiffs and Plaintiffs' Counsel may also inspect work being done in the City's pedestrian rights-of-way to install accessible curb ramps or to remediate existing curb ramps in order to monitor compliance with the Consent Decree.  *Id.*  Any review by Plaintiffs and/or their Counsel shall be undertaken in a manner to assure it will not unreasonably interfere with the City's operations.  Throughout the Term, Plaintiffs may request to meet with the City to discuss the City's efforts to implement the Consent Decree and attempt to resolve any disputes regarding its implementation or enforcement.  *Id.* § V.7.2.

The City will pay Plaintiffs' Counsel their reasonable attorneys' fees, expenses, and costs for work performed during the Compliance Period that is reasonably necessary to monitor, implement, and administer the Consent Decree, subject to the following limitations: for the first year ending December 31, 2018, up to a cap of $40,000; for the second year ending December 31, 2019, up to a cap of $40,000; for years 3 to 18 including January 1, 2020 through the end of the Term, up to a cap of $20,000 per year.  *Id.* § VI.2.2.

**D.**    **Dispute Resolution**

Enforcement of the Consent Decree will be subject to the continuing jurisdiction of this Court.  *Id.* § V.9.3.  If either party believes that a dispute exists relating to any violation of or

failure to perform any of the provisions, that party will first provide a written statement describing the alleged breach, after which the other party will have 15 business days to provide a written response and 45 days to cure the alleged breach. *Id.* § V.9.1. At that point, if the party alleging a breach is not satisfied, the parties will meet and confer in person or by telephone, and the other party will have an additional thirty days to cure. *Id.* If the parties are unable to resolve the dispute informally, they will engage in good faith efforts to resolve it through mediation. *Id.* § V.9.2. The City will pay Plaintiffs' Counsel their reasonable attorneys' fees, expenses, and costs incurred in resolving disputes, subject to a cap of $50,000 per dispute. Should the Parties mediate a dispute, they shall evenly split any fees paid to the mediator. *Id.* § VI.2.5.

**E.      Release of Claims**

In exchange for the injunctive relief proposed in the Agreement, Plaintiffs have agreed to release any injunctive, declaratory, or nonmonetary claims against the City that were brought, could have been brought, or could be brought now or in the future by the Settlement Class relating to or arising from any of the City's alleged actions, omissions, incidents, or conduct related to the installation, remediation, repair or maintenance of curb ramps in the City's pedestrian right-of-way at any time prior to the effective date of the Consent Decree through the end of the Term. *Id.* § VIII.1. The release does not apply to claims related to monetary damages, personal injuries, or property damage with respect to unnamed Class Members. *Id.* It also does not apply to components of the City's sidewalk system other than curb ramps. *Id.* § V.2.

**F.      Awards to Named Plaintiffs and Class Counsel's Attorneys' Fees, Expenses, and Costs**

Subject to Court approval after an application by Plaintiffs, the City will pay each of the Named Plaintiffs $5,000 in consideration for their release of claims and in recognition of the

services they rendered to the Class.  *Id.* § VII.1.  The City agrees that, if the Court grants preliminary and final approval of the Consent Decree, Plaintiffs are prevailing parties for the purposes of awarding reasonable attorneys' fees and costs.  Plaintiffs will move separately for an award of reasonable attorneys' fees, costs, and expenses in the amount of $1,400,000, pursuant to Rule 23(h) of the Federal Rules of Civil Procedure.  The City shall not oppose Plaintiffs' motion.

### III.    LEGAL ARGUMENT

### A.    Class Certification Has Already Been Granted and Remains Appropriate.

Under Rule 23(a) of the Federal Rules of Civil Procedure, a class is appropriate for certification if it meets four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

> The Court previously certified a Class in its May 2, 2016 order, defined as:
> All persons (including residents of and/or visitors to the City of Seattle) with any mobility disability, who, at any time prior to judgment in this action, have been denied full and equal access to the City of Seattle's pedestrian right of way due to the lack of a curb ramp or a curb ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use.

(ECF No. 30.)  The Settlement Class definition set forth in the Consent Decree is identical and therefore does not impact the satisfaction of the Rule 23(a) and 23(b)(2) requirements.

The proposed Settlement Class continues to meet the requirements of numerosity, commonality, typicality, and adequacy of representation.  The Settlement Class is still comprised of tens of thousands of persons with mobility disabilities who, like the Named Plaintiffs, have encountered inaccessible curb ramps throughout the City's pedestrian right-of-way and seek indivisible injunctive relief.  The Supreme Court has observed that such civil rights class actions are particularly well-suited for certification under Rule 23(b)(2).  *See Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338, 361 (2011) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).  Accordingly, the parties respectfully request that the Court certify the Class for settlement purposes under Rule 23(b)(2).

>   1.   __The Court Should Appoint the Named Plaintiffs to Represent the Settlement Class.__

Rule 23 requires that "the representative parties will fairly and adequately protect the interests of the Class." Fed. R. Civ. P. 23(a)(4).  To satisfy this element, named plaintiffs must establish that they do not have a conflict of interest with the Settlement Class.  *Hanlon*, 150 F.3d at 1021.  Here, there is no conflict of interest between the Named Plaintiffs and the proposed Settlement Class.  Furthermore, the Named Plaintiffs have ably prosecuted the interests of the Class since the commencement of this action in 2014.  (*See* Fox Decl. ¶¶ 14-8; ECF Nos 29-5 ¶¶ 8-10, 29-6 at 9-11, 29-7 at 8-10.)

>   2.   __The Court Should Appoint Class Counsel to Represent the Settlement Class.__

Class Counsel meet the adequacy requirement under Rule 23.  Class Counsel have extensive experience in disability class actions and understand the law applicable to this case. (*See generally* Declaration of Timothy P. Fox in Support of Joint Motion for Class Certification (ECF 29-4); Declaration of Linda M. Dardarian in Support of Joint Motion for Class Certification (ECF 29-2); Declaration of David Carlson in Support of Joint Motion for Class Certification (ECF 29-3).  Class Counsel have diligently investigated, evaluated, litigated, and negotiated the claims asserted in this case.  *Id.*  Class Counsel have also invested substantial resources in this case to protect the interests of the Class.  *Id.* at ¶ 18.  Thus, the Court should appoint Plaintiffs' Counsel as Settlement Class Counsel pursuant to Rule 23(g).

**B.**     **The Class Action Settlement Embodied in the Consent Decree Is Fair and Reasonable and Should Be Granted Preliminary Approval.**

Judicial approval of a class action settlement under Rule 23 generally involves three steps. First, at the preliminary approval hearing, the parties "submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation." Federal Judicial Center, Manual for Complex Litigation (4th ed. 2004), § 21.632 ("Manual"). Second, if preliminary approval is granted, the class representatives must disseminate notice of the proposed settlement to affected class members. *Id.* § 21.633. Third, the court conducts a final approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning fairness, adequacy, and reasonableness of the settlement are presented. *Id.* § 21.634. This procedure safeguards class members' procedural due process rights and enables the court to fulfill its role as the guardian of class interests. *See* Newberg on Class Actions, § 13.39 (5th ed. 2016) ("Newberg").

The law favors compromise and settlement of class action lawsuits. *See, e.g.*, *Churchill Vill. L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). The Ninth Circuit recognizes the "overriding public interest in settling and quieting litigation . . . particularly . . . in class action suits . . . ." *Van Brokhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976); *see also In re Synocor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) ("There is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.").

"[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge because [s]he is exposed to the litigants and their strategies, positions, and proof." *Hanlon*, 150 F.3d at 1026 (internal citations and quotations omitted). This determination

1   involves a balancing of several factors, including: the strength of the plaintiff's claims; the likely

2   risks and expenses involved in further litigation; the risk of maintaining class action status

3   throughout trial; the value offered in settlement; the extent of discovery and other litigation

4   completed; the experience and views of counsel; and the views of class members toward the

5   settlement.  *See Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537, 542 (W.D. Wash. 2009).

6        At the preliminary approval stage, the Court need only find that the proposed settlement

7   is within the "range of reasonableness" such that it is appropriate to disseminate notice to the

8   class and schedule a fairness hearing.  5 Newberg § 13.15; *see also Arthur v. Sallie Mae, Inc.*,

9   2012 WL 90101, at *9 (W.D. Wash. 2012); *Carter v. Anderson Merchs., LP*, Nos. EDCV 08-

10  00025-VAP (OPx), EDCV 09-0216-VAP (OPx), 2010 WL 144067, at *4 (C.D. Cal. Jan. 7,

11  2010); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007).

12  Preliminary approval of a proposed class action settlement is appropriate where the settlement

13  "appears to be the product of serious, informed, non-collusive negotiations, has no obvious

14  deficiencies, [and] does not improperly grant preferential treatment to class representatives or

15  segments of the class . . . ."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079 (internal

16  citations and quotations omitted); *see also* Manual § 21.62 (preliminary approval involves an

17  initial evaluation of the reasonableness and adequacy of settlement; reasonableness turns on

18  "analysis of the class allegations and claims and the responsiveness of the settlement to those

19  claims," while adequacy involves a "comparison of the relief granted to what class members

20  might have obtained without using the class action process").

### 1.   The Settlement Is Entitled to a Presumption of Fairness.

        Where a settlement is the product of arms-length negotiations conducted by experienced

class counsel, the Court begins its analysis with a presumption that the settlement is fair and

reasonable.  *See* 5 Newberg § 13.45; *Dunakin v. Quigley*, 2017 WL 123011, at *2 (W.D. Wash. 2017); *Nat'l Rural Telecomm's Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004). Thus, at this stage, so long as the settlement falls into the range of possible approval — giving deference to the result of the parties' arms-length negotiations and the judgment of experienced counsel following sufficient investigation and discovery — the presumption applies and the settlement should be preliminarily approved.

First, the parties reached the Consent Decree after four formal mediation sessions under the supervision of Teresa A. Wakeen and many in-person and telephone negotiations between counsel.  Negotiations took place over the course of more than three years.

Second, Class Counsel have extensive experience litigating and settling disability rights class actions and other complex matters.  (*See* Fox Decl. ¶ 41; Declaration of Timothy P. Fox in Support of Joint Motion for Class Certification (ECF 29-4); Declaration of Linda M. Dardarian in Support of Joint Motion for Class Certification (ECF 29-2); Declaration of David Carlson in Support of Joint Motion for Class Certification (ECF 29-3).  They have diligently investigated the factual and legal issues raised in this action for over three years.  (Fox Decl. ¶¶ 5-12.)  As noted above, extensive discovery, both formal and informal, has allowed the parties to assess the strengths and weaknesses of the claims herein and the benefits of the Consent Decree.  (*Id.*) Class Counsel are confident that the relief achieved by the proposed settlement is sufficient to address the concerns identified in the Complaint.  (*Id.* ¶¶ 35-7.)  Thus, the fact that qualified, well-informed counsel endorse the Consent Decree as being fair, reasonable, and adequate weighs in favor of preliminary approval.  *See True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1078-79 (C.D. Cal. 2010); *Nat'l Rural Telecomm's Coop.*, 221 F.R.D. at 528.

**2.** **The Settlement Is Fair Given the Benefits to the Class and the Risks Associated with Continued Litigation.**

The significant benefits that the Settlement Class will enjoy under the Consent Decree, considered in light of the risks of litigation, support preliminary approval.

*i.* *The Settlement Will Result in Substantial Benefits to the Class.*

Under the Settlement, 1,250 curb ramps in the City will be installed or remediated every year for the next eighteen years.  The Consent Decree makes allowances for minor variations to this schedule, but it guarantees the installation or remediation of 22,500 curb ramps during the Term, a commitment that substantially exceeds past rates of curb ramp construction in the City. Fox Decl. ¶ 34.  In meeting this requirement, when the City alters roadways or pedestrian facilities, it will install curb ramps where missing and upgrade curb ramps where present but noncompliant.  Similarly, where streets are altered by utilities, other public entities, or private developers, curb ramps will be installed or remediated.  As a result of these provisions, nearly $300 million dollars will be spent installing and remediating curb ramps in the City in compliance with federal and state disability access laws.  *Id.*  In addition, the City's curb ramp request system will enable Class Members to have input on the locations of the curb ramps that the City will install and remediate.  *Id.* ¶ 2.  Class Counsel are confident that the curb ramp installation and remediation required by the Consent Decree is sufficient to provide for a system of curb ramps that, when viewed in its entirety, will be readily accessible to persons with mobility impairments.  *Id.* ¶ 10.

Thus, the Consent Decree will provide injunctive relief that is reasonably calculated to effectuate the repairs necessary to make the City's curb ramps accessible to persons with mobility disabilities.  This is an excellent result for the Settlement Class, and it is unlikely that this Court would order greater relief.  (Fox Decl. ¶ 32.)  In comparison, courts routinely approve

class action settlements in which the value of class relief is much less than what could have been obtained at trial.  *See, e.g.*, *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *2 (C.D. Cal. June 10, 2005) (a proposed settlement should not "be judged against a hypothetical or speculative measure of what might have been achieved") (quoting *Officers for Justice*, 688 F.2d at 625)); *Rinky Dink, Inc. v. World Business Lenders, LLC*, 2016 WL 4052588, at *5 (W.D. Wash. 2016) ("a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement ... unfair") (citing *Officers for Justice*, 688 F.2d at 628).  Accordingly, the substantial benefits to the Settlement Class weigh in favor of preliminary approval of the Consent Decree.

### ii.   *The Litigation Risks Support Preliminary Approval.*

The potential risks attending further litigation support preliminary approval.  "Estimates of what constitutes a fair settlement figure are tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years)."  *Schaffer v. Litton Loan Servicing, LP*, No. CV 05-07673 MMM (JCx), 2012 WL 10274679, at *11 (C.D. Cal. Nov. 13, 2012).  Litigation and trial of this matter would require the expenditure of significant resources by the Parties and the Court, including resources and time spent on fact and expert discovery, further analysis of data, depositions of Class Members, City employees, and experts.  Additional resources would be required to complete post-trial briefing and resolve any appeals.  Fox Decl. ¶ 39.  In short, this Settlement obviates the need for further costly and time-consuming litigation that will be better spent on increasing accessibility.

In addition, this case presents several novel issues that the City raised in its Answer to Plaintiffs' Complaint or in settlement negotiations, which could be resolved against Plaintiffs.  Those novel issues include the City's alleged liability for and its defenses to claims that the City

failed to provide program access to its pedestrian rights-of-way under the ADA and Section 504, and whether the City can be held liable for curb ramp accessibility claims dating back to 1977, the effective date of Section 504.  Accordingly, there is real risk associated with continued litigation.  Fox Decl. ¶ 40.  Here, proceeding to trial, along with possible appeals, could delay resolution of this matter by several years.  Fox Decl. ¶ 41.  By contrast, under the Consent Decree, improvements will begin immediately after the Court grants final approval.  *See* Decree Definition I; Fox Decl. ¶ 41.  By December 31, 2017, 625 curb ramps in the City will have been installed or remediated under the terms of the Decree.  Decree § V.3.1.  Given the importance of the accessibility of the City's pedestrian rights-of-way to Class Members' lives, the difference between the possibly long delay involved in continued litigation and the immediate improvements promised by the Consent Decree is an important consideration.  The risks of continued litigation therefore weigh in favor of preliminary approval.  Fox Decl. ¶ 42.

**C.      The Proposed Notice Satisfies Due Process and Should Be Approved.**

Rule 23(e) of the Federal Rules of Civil Procedure provides that "notice of the proposed dismissal or compromise shall be given to all members of the Class in a manner that the court directs."  Due process requires that interested parties be provided with notice reasonably calculated under the circumstances to apprise them of the pendency of the action and afford them an opportunity to present their objections.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  Notice is satisfactory "if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'"  *Churchill Vill.*, 361 F.3d at 575 (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)).  Additionally, notice must be reasonably calculated to reach interested parties.  *Mullane*, 339 U.S. at 318.

The notice standard is satisfied here.  Within 30 days after issuance of the Preliminary Approval Order, the City will cause notice of the settlement to be published for four (4) consecutive weeks in the following papers of general circulation: *The Seattle Times* in English, *El Mundo* in Spanish, *Seattle Chinese Post* in Chinese, and *Northwest Vietnamese News* in Vietnamese.  Such notice will include: (i) a brief statement of the *Reynoldson* Action, the settlement embodied in the Consent Decree, and the claims released by the Settlement Class; (ii) the date and time of the Fairness Hearing and/or Final Approval Hearing of the proposed Consent Decree; (iii) the deadline for submitting objections to the proposed Consent Decree; and (iv) the web page, address, and telephone and fax numbers that may be used to obtain a copy of the Notice of Settlement (substantially in the form attached to the Consent Decree as Exhibit "B") in English, Spanish, Chinese and Vietnamese, or alternative accessible formats for individuals with visual impairments.  The City will pay the costs for the publication of the notice. Within ten days after the issuance of the Preliminary Approval Order, Class Counsel will cause a copy of the Notice of Settlement to be provided to a list of organizations that serve individuals with Mobility Disabilities.  The list of organizations is Exhibit "C" to the Consent Decree.

Finally, within 20 days after the issuance of the Preliminary Approval Order, each firm making up Class Counsel will post on its website a copy of the Notice of Settlement in English, Spanish, Chinese and Vietnamese, and in an accessible electronic format that can be recognized and read by software commonly used by individuals with visual impairments to read web pages. The City will likewise post a copy of the Notice of Settlement on the City's official website (www.seattle.gov) for four consecutive weeks, and will make the notice available in English, Spanish, Chinese and Vietnamese.

The parties have developed this proposed plan for distribution of the notice taking into account the breadth and magnitude of the Settlement Class.  Distribution of the notice through publication in multiple languages in multiple local newspapers and posting on multiple accessible websites, coupled with facilitating the direct mailing or emailing of the notice to individual members of the Settlement Class by those organizations that serve them, will ensure that the notice reaches the maximum number of members of the Settlement Class in the most efficient and cost-effective manner.  The proposed form of notice and the proposed distribution plan will fairly apprise members of the Settlement Class of the settlement and their options with respect thereto, and fully satisfy due process requirements for a Rule 23(b)(2) settlement class with no opt-out rights.  The Court should approve the proposed notice and direct that it be distributed.

**D.     The Court Should Approve the Proposed Scheduling Order, Including Setting a Date for the Fairness Hearing.**

Once a court grants preliminary approval and notice is provided, the court conducts a "fairness hearing," at which all interested parties have an opportunity to be heard.  At such a hearing, the court conducts a substantive evaluation of the proposed settlement to determine whether it is "fundamentally fair, adequate, and reasonable."  *See Officers for Justice*, 688 F.2d at 625; *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 319 (C.D. Cal. 2016) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 980 (9th Cir. 2003)).

The parties propose the following schedule:

| Case Event | Date |
|---|---|
| Preliminary Approval Order Issued | To be determined by the Court |
| Plaintiffs Distribute Notice to Organizations | Within 10 days after entry of order granting preliminary approval |
| City and Plaintiffs' Counsel Post Notices on Website | Within 20 days after entry of order granting preliminary approval |
| | |

| Initial Publication of Settlement Notice in The Seattle Times, El Mundo, Seattle Chinese Post, and Northwest Vietnamese News | Within 30 days after entry of order granting preliminary approval |
|---|---|
| Deadline for Plaintiffs to file Motion for Attorneys' Fees, Expenses, and Costs, and Application for Service Awards to Named Plaintiffs | 14 days prior to the deadline for Class Member objections |
| Deadline for Objections by Class Members | Within 45 days after initial  publication of Settlement Notice |
| Deadline for Class Counsel and/or the City to respond to any timely-filed objections | 5 days before Fairness Hearing |
| Fairness Hearing | To be determined by the Court (requested for first week of October) |
| Final Approval | To be determined by the Court |

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the parties respectfully request that this Court: (1) grant preliminary approval of the Consent Decree; (2) certify the proposed Settlement Class and appoint Named Plaintiffs and their counsel as proper representatives of the Settlement Class; (3) approve and direct the publication of the class notice proposed by the Parties; and (4) schedule a fairness hearing for final approval of the Consent Decree.

RESPECTFULLY SUBMITTED this 17th day of July, 2017.

GOLDSTEIN, BORGEN, DARDARIAN & HO

 *s/ Linda M. Dardarian*
Linda M. Dardarian (CA SBN 131001)
ldardarian@gbdhlegal.com
Andrew P. Lee (CA SBN 245903)
alee@gbdhlegal.com
Raymond A. Wendell (CA SBN 298333)
rwendell@gbdhlegal.com
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Telephone:  510-763-9800
Facsimile:  510-835-1417
Attorneys for Plaintiff and the Putative Class

PETER S. HOLMES
Seattle City Attorney


 _s/ Lorraine L. Phillips_
Lorraine Lewis Phillips
Assistant City Attorney


PACIFICA LAW GROUP LLP


By _s/ Kymberly K. Evanson_
        Paul J. Lawrence WSBA # 13557
        Kymberly K. Evanson, WSBA #39973

Attorneys for Defendant City of Seattle